# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| **ROCHELLE D. BATCHELOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 3:05 CV 791** |
| | ) | |
| **MERCK & CO., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the court is a motion for summary judgment filed by defendant Merck & Co., Inc. (DE # 57.) Plaintiff Rochelle D. Batchelor has responded to the motion (DE # 76), defendant has replied (DE # 78), and plaintiff has filed a sur-reply (DE # 82), after receiving permission to do so from the court (DE # 80; DE # 81). For the reasons explained below, the court grants the motion for summary judgment.

## I. BACKGROUND

Plaintiff worked for defendant as a sales representative in the South Bend, Indiana area, from August 2002 until June 2005. This sales representative position required plaintiff to sell specific prescription drugs offered by defendant to doctors and pharmacies. (DE # 60 at 5-8.) Throughout her time working for defendant, plaintiff was an at-will employee. (DE # 64 at 2.) Plaintiff's formal title when first hired was "medical representative." (*Id.*) In October 2003, she was promoted to the rank of "professional representative." (DE # 65 at 28.) Sixteen months later, on February 15, 2005, plaintiff was given a "30-day warning letter." (DE # 68 at 2-6.) Then, on March 25, 2005, plaintiff

was placed on a 90 day "performance improvement plan" (PIP). (DE # 69 at 13-16.) At the conclusion of the PIP, on June 24, 2005, defendant fired plaintiff. (DE # 61 at 17.)

Plaintiff claims that defendant violated the Pregnancy Discrimination Act (PDA) by discriminating against her and firing her due to her expressed intent to become pregnant. (DE # 1 at 6.) She also claims that defendant retaliated against her after she complained about her supervisor's discrimination and filed an EEOC complaint. (*Id.*) Defendant counters that plaintiff was fired because of poor performance.

*A. Training and Evaluation Structure*

Defendant has an extensive program of training, evaluation and support for its sales employees. Shortly after her hiring, plaintiff participated in an eight-week sales training course. (DE # 60 at 9.) After beginning her duties as a salesperson, she received evaluations in the form of "field trip reports," written by a supervisor who would accompany her on a day's worth of sales calls; these field trips occurred about every month. (*Id.* at 13.) In addition to evaluating plaintiff's performance, these field trips were designed to help plaintiff improve her sales skills by giving her immediate feedback on her performance and the chance to ask questions and discuss issues with her supervisor. (*Id.*)

From August 2002 until 2004, plaintiff's supervisor was a man named James Lengel. (DE # 60 at 13.) After Lengel accompanied plaintiff on a field trip, he would compose a field trip report on a particular form used by defendant, titled "INDY GROUP C FIELD TRIP PERFORMANCE SUMMARY." (*See* DE # 64 at 13-14.) This form

had numerous categories, known as "Key Sales Competencies," where Lengel was asked to evaluate plaintiff. (*See id.*) These included groups of "competencies" under the headings of "Selling Skills," "Product and Disease Knowledge," "Teamwork," "Business Management," and "Customer Knowledge." (*Id.*) Plaintiff was rated on these competencies using an oddly unclear metric. A particular competency was either "Observed," "Increase Focus," or "N/A or Not Observed." (*Id.*) Lengel was then given room to provide written comments on plaintiff's performance in the different competency areas. (*Id.*)

In addition, the form used by Lengel usually provided the statistical sales performance of the group or "cluster" within which plaintiff worked. (*See* DE # 64 at 13.) Plaintiff's cluster consisted of her and a number of other coworkers, ranging from one to three additional people. (DE # 58 at 13.) One sales metric was called "PPO", which stood for "percentage to plan objective," with a 100% rating meaning the cluster was meeting its objective, over 100% it was exceeding its objective, and less than 100% meaning it was not meeting its objective. (DE # 60 at 14.) Another metric was entitled "Cluster Region Rank," and indicated the sales performance of the cluster in comparison to other clusters in the region. (*See* DE # 63 at 8-9; DE # 64 at 17.)

At some point in the Spring of 2004, a new supervisor, Paul Martin, replaced Lengel. (DE # 60 at 17.) Martin accompanied plaintiff on field trips with about the same frequency as Lengel, but he wrote up his evaluations of these trips on a different form, an apparently computerized form entitled "National Field Trip Report." (*Id.*; *see* DE # 65

at 30.) These reports also had an extensive number of categories where plaintiff was evaluated, with the categories sorted under the headings of "Meet or Exceed Planned Sales Objective," "Maximize Market Share Opportunities," "Quality Customer Selling," "Business Planning and Execution," and "Product and Resource Expertise." (*See* DE # 66 at 4-7.) This form rated employees via a 1 to 5 scale, with "N/A" also an option. (*Id.*) A "1" meant the subject was "significantly below objective," a "2" "somewhat below objective," a "3" "met objective," a "4" "somewhat above objective," and a "5" "significantly above objective." (DE # 65 at 30.) This form also provided the evaluator room to make written comments. (*See* DE # 66 at 4-7.)

In addition, while plaintiff was supervised by both Lengel and Martin she received annual reviews. (*See* DE # 65 at 7-29; DE # 68 at 11-19; DE # 69 at 1-4.) These reviews provided the sales results and ranks of plaintiff's cluster, and subjectively evaluated plaintiff on a variety of criteria. (*See* DE # 65 at 8.) The subjective grades were on a scale where her evaluator marked an "X" on a scale ranging from "Delivered Significantly Below Objective" (far left) to "Delivered on Objective" (center) to "Delivered Significantly Above Objective" (far right). (*See id.*; DE # 68 at 15.) This scale allowed an evaluator to place an "X" somewhere between the various grades. (*Id.*) Thus, one could receive a mark halfway between Delivered on Objective and Delivered Significantly Above Objective, or a mark between Delivered Significantly Below Objective but a third of the way toward Delivered on Objective. These review forms also required evaluators to provide written commentary on their ratings, and to give a

general summary of the employee's performance. (*See* DE # 65 at 28; DE # 69 at 2-3.) In addition, the employee had the option to make comments on the review. (*See* DE # 65 at 18.)

*B. Plaintiff's Initial Performance and Evaluations*

From the beginning of her employment with defendant, plaintiff's performance and evaluations were mediocre. Plaintiff began selling defendant's prescription drugs in August 2002. On her first field trip report, which noted that her cluster was ranked 11th, 11th, and 12th in its "PPO YTD" evaluation, plaintiff received 9 marks of "observed" competencies, and 12 marks of "increase focus" (DE # 64 at 9-11), which meant that a salesperson needed to "focus more on those skills." (DE # 60 at 14.) Her next field trip report showed the same sales numbers for her groups, and plaintiff received 6 marks of observed, but 15 increased focuses, and 2 "N/A or Not Observed." (DE # 64 at 13-14.)

Under Lengel, plaintiff did show some improvement at times, earning a high of 14 observed marks with only 9 increase focuses on the field trip report for February 3, 2003, but this same report showed that her cluster's sales rankings were only 15th, 10th, and 16th for the three drugs they were selling. (DE # 64 at 21.) While being supervised by Lengel, plaintiff received more marks of observed than increase focus on only three occasions, while receiving more increase focus marks on nine reports. The highest any of her group's three sales rankings rose was 4th; the lowest was 16th. Overall, under Lengel, plaintiff averaged 10.1 observed and 12.2 increase focus marks on her field trip

reports. (DE # 64 at 9-30; DE # 65 at 1-4.) Her cluster's average rankings within the region were 8.8, 8.8 and 8.7, although at some point plaintiff's group stopped selling the drug Zocor, and began selling Zetia in its place. (*Id.*)

While working under Lengel, plaintiff received two year-end reviews. She had her first review at the end of 2002, after she had only been on the job for about four months. (DE# 65 at 7.) The summary of the graded portion of this review showed that plaintiff received four scores of "delivered on objective," the mid-point of the evaluation scale, and four scores that were below the mid-point. (*Id.* at 16.) One of the scores below the midpoint was "Group Product PPO," which was weighted as 40% of the entire evaluation. (*Id.*) Overall, plaintiff received marks below delivered on objective for categories that comprised 66% of the review's weight, receiving marks of delivered on objective for the remaining 34%. (*Id.*) Plaintiff did not receive any marks above delivered on objective on this review. The review also stated that she "delivered below" her cluster's sales objective with a 97.5% PPO (with 100% being the objective), ranking "#13 in the Indianapolis Region." (DE # 65 at 8.) Plaintiff testified that this review was accurate. (DE # 60 at 15.)

Lengel also composed plaintiff's 2003 year-end review, which evaluated her on a full year of sales. (DE # 65 at 19.) The summary portion of this review gave plaintiff below the mid-point of "delivered on objective" for three objectives, with a mark of delivered on objective for "Personal Development" and a mark just above delivered on objective for "Market Share Growth - Singulair." (DE # 65 at 27.) Overall, plaintiff

received marks below delivered on objective for categories that comprised 65% of the review's weight, a mark slightly above delivered on objective for 25%, and a mark at delivered on objective for the remaining 10%. (*Id.*) Like the previous review, the 2003 review stated that plaintiff "delivered below her" sales objective, with a 96.7% PPO that ranked #8 in the region. (*Id.* at 20.) The review summarized that plaintiff "delivered below the overall plan performance in 2003," although she had been promoted to the rank of Professional Representative in October 2003. (*Id.* at 28.) Plaintiff did not disagree that this review was an accurate evaluation of her performance. (DE # 60 at 16.)

Plaintiff testified that overall Lengel was a "tough" evaluator, but that he treated her fairly and that they "saw eye to eye" on most of her evaluations. ( DE # 60 at 13, 15.)

*C. Plaintiff's Performance and Evaluation under Paul Martin*

Paul Martin became plaintiff's supervisor some time in the Spring of 2004. (DE # 60 at 17.) His field trip reports evaluated plaintiff on several different categories using a 1 to 5 scale, with 1 being the worst, 5 the best and "N/A" also an option, and did not always provide the sales statistics of plaintiff's group. (*See* DE # 66 at 8-15.) On the first field trip report submitted by Martin, plaintiff received one score of 2, ten scores of 3, and one score of 4. (DE # 65 at 30; DE # 66 at 1-3.) On his second evaluation of her, Martin gave her two scores of 2 and twelve scores of 3. (DE # 66 at 4-7.) On her third evaluation, she received one score of 2, and 9 scores of 3. (*Id.* at 8-11.)

On her fourth field trip with Martin, on August 11, 2004, Martin gave plaintiff substantially worse scores— four scores of 1, seven scores of 2, and only four scores of

3. (DE # 66 at 12-15.) This report also noted the sales statistics for plaintiff's cluster through the first half of 2004. (*Id.* at 12-13.) Of the two drugs plaintiff's cluster sold, her group had a PPO of 94.5% and 92.7%, ranking it 8th in the region for both drugs. (*Id.*) There were 11 clusters in the region at the time. (DE # 63 at 8.) According to plaintiff, on this date she had a knee injury that was causing her significant pain and that negatively effected her sales performance. (DE # 60 at 19.) Plaintiff stated that she should have called in sick that day. (*Id.*)

On the following field trip, which occurred on August 30, 2004, plaintiff again received sub-par marks– one 1, nine 2s, and four 3s. (DE # 66 at 16-18; DE # 67 at 1.) The comments on this report state that plaintiff "failed to offer a PI following a product discussion" twice, which was "a very serious Policy Violation." (DE # 67 at 1.) In her deposition, plaintiff disputed that she failed "to offer a PI" on this field trip, and challenged the accuracy of the report. (DE # 60 at 20.) After this field trip, Martin wrote a "Field Visit Addendum." (DE # 67 at 2-4.) Such addendums apparently served to further detail issues that arise during a field trip (*id.*), and plaintiff seems to treat such addendums as an indication that the supervisor found the particular trip to be especially poor. In the addendum, Martin reviewed various "tasks" that plaintiff had for the trip, and gave written explanations on how he believed plaintiff should improve. (*Id.*) For each of the tasks, he gave plaintiff a "rating" of 2 for the field trip. (*Id.*)

Plaintiff's next two field trips merited her improved marks. On her September 8, 2004 field trip report, she received one 1, no 2s, thirteen 3s, and one 4. (DE # 67 at 5-8.)

And on her October 26, 2004 field trip, she received no 1s, only one 2, and sixteen 3s. (DE # 77-20 at 3-6.) On her following field trip, on November 9, 2004, Martin gave her three 2s and sixteen 3s. (DE # 67 at 12-15.) That same report detailed that the sales numbers for plaintiff's group had lagged further: its PPOs were 92.9% and 91.2%, ranking her group 11th and 8th in its region respectively. (*Id.* at 12-13.) After this November 11, 2004 field trip report, Martin wrote plaintiff another memorandum. (*Id.* at 16-18.) For each of the various "tasks" Martin lays out in his memorandum, he explains "Year to Date, your cumulative score is below a 3" (*id.*), meaning that on all of the tasks on which Martin evaluated plaintiff she was performing below the midpoint "met objective" level.

Combining all of the field trip reports that plaintiff received under Martin during 2004, she received a total of six 1s, twenty-five 2s, eighty-two 3s, two 4s, and zero 5s. Her average score for this period was 2.7.

Plaintiff also received a "Year-End Review" for 2004. (DE # 68 at 11-19; DE # 69 at 1-4.) This review was highly negative, giving plaintiff marks either at or close to the bottom range on four of her six "objectives." (DE # 69 at 1.) In addition, the four categories where she scored quite poorly comprised 85% of her evaluation. (*Id.*) Her two lowest marks were for "Product Sales" and "Market Share Change." (*Id.*) Her highest marks were at the midpoint "Delivered On Objective," which she received on her "Product & Resource Expertise" and "Personal Development" objectives. (*Id.*) This review also listed her group's PPO as 92%, and its rank in the region as 11th. (DE # 68 at

11.) The first sentence of the review's comments section states that plaintiff "finished the year at 93.1% PPO for SINGULAIR®, ranked 9 out of 11 in the Region, and 90.8% PPO for FOSAMAX®, ranked 11 out of 11 in the region." (DE # 69 at 2.) In the review's employee comments section, plaintiff indicated that she "strongly disagree[d] with several parts" of the review and that she had been told she had been meeting expectations. (DE # 69 at 4.) Plaintiff's signature and date on the review indicates that she filled out this portion in March 2005. (*Id.*)

No field trips appear to have occurred between November 2004 and February 15, 2005, the date when Martin issued plaintiff a "30-day warning letter." (DE # 68 at 2-6.) Such a letter serves as the first of two steps in a probation-like process Merck has for underperforming sales employees, where they are given intensified coaching in effort to improve their performance. (*Id.* at 6.) The warning letter outlined areas where Martin believed plaintiff needed to improve, and specified "training requirements" that plaintiff needed to undertake. (*Id.* at 2-6.) Plaintiff testified that Martin "made it seem like [the warning letter was] not a big deal" and told her that "all you need to do is step up on the business analytics, and you'll satisfy the warning letter." (DE # 61 at 6.) However, plaintiff admitted that Martin warned her "if it didn't improve that I would be put on a performance improvement plan." (*Id.*) At some point around this time, some coworkers and customers "commented to [plaintiff] about Martin's treatment of her." (DE # 77-2 at 14; DE # 77-4 at 2.) Plaintiff does not explain what these unnamed persons said about Martin's behavior.

The issuance of a warning letter resulted in Martin going on field trips with plaintiff somewhat more frequently, with the first occurring on February 22, 2005. (DE # 67 at 23-25; DE # 68 at 1.) The report for this field trip noted that plaintiff's cluster continued to have poor sales figures, ranking 9th and 11th out of eleven clusters in December 2004. (DE # 67 at 23-24.) On the report, plaintiff scored seven 2s (which, again, stand for "somewhat below objective") and eleven 3s ("met objective"). (DE # 67 at 23-25; DE # 68 at 1.) On her next report, based on a March 9, 2005 field trip, plaintiff's cluster's sales figures appeared to be up in 2005, with PPOs of 103.3 and 99.5, ranking it 4th and 3rd in the region. (DE # 68 at 7-8.) However, that same report awarded plaintiff seven 2s and only seven 3s. (*Id.* at 7-10.) Plaintiff believed that her performance had improved over the course of the 30-day warning period because she was "running more reports." (DE # 61 at 9-10.)

Then on March 25, 2005, plaintiff was placed on a 90-day "performance improvement plan" (PIP), the second step in defendant's process for underperforming employees. (DE # 69 at 13-19.) Similar to the 30-day warning letter, the PIP outlined areas where plaintiff needed to improve, explained what was expected of her, and reviewed the ways in which she had failed to meet expectations. (*Id.* at 13-16.) The letter warned that "unless you show immediate and sustained improvement . . . your employment may be terminated." (*Id.* at 16.) Plaintiff was "stunned" when she received the PIP, as she testified Martin had led her to believe that her performance issues had been "resolved." (DE # 61 at 10.)

Unfortunately, plaintiff's evaluations failed to improve after being placed on the PIP. On her next field trip with Martin, held on April 11, 2005, plaintiff received six 2s and eight 3s. (DE # 70 at 1-4.) After this field trip, Martin presented plaintiff with an updated PIP, which again outlined the areas where plaintiff had failed to meet expectations and was required to improve. (*Id.* at 5-7.) A field trip on April 21, 2005, resulted in plaintiff receiving five 2s and nine 3s. (*Id.* at 8-11.) Again, Martin provided plaintiff with an updated PIP that discussed the April 21 field trip in detail and laid out areas where she needed to improve. (*Id.* at 12-15.) On her May 11, 2005 field trip report, plaintiff received again five 2s and nine 3s. (*Id.* at 16-17; DE # 71 at 1-2.) The report for her May 27, 2005 field trip resulted in plaintiff receiving five 2s and nine 3s once more. (DE # 71 at 3-6.) This same report showed that, from January to April 2005, the sales performance of plaintiff's cluster had improved, with PPOs of 101.9 and 98.4 and ranks of 4th and 3rd. (*Id.* at 3-4.) However, the updated PIP that incorporated the May field trips again told plaintiff that Martin was "not seeing the level of performance needed" from her. (*Id.* at 14.) In her last field trip on June 16, 2005, where Martin used a slightly expanded "National Field Trip Report" form, plaintiff received five 2s and ten 3s. (*Id.* at 15-19.) Martin then submitted one additional updated PIP, incorporating his review of her performance on June 16, 2005. (*Id.* at 20-21; DE # 72 at 1-9.)  Defendant terminated plaintiff's employment on June 24, 2005. (*Id.* at 10.)

In her seven field trip reports in 2005, plaintiff received a total of zero 1s, forty 2s, sixty-three 3s, zero 4s, and zero 5s. These scores average to 2.4.

*D. Plaintiff's Statements About Pregnancy*

Plaintiff married her now ex-husband in June 2000 and divorced him in December 2006, and was thus married during her employment with defendant, although she and her husband lived apart at times. (DE # 60 at 5.) On December 18, 2004, plaintiff attended a holiday party at the home of her former supervisor Jim Lengel. (DE # 61 at 3-4.) Paul Martin, Greg Sautter (who was a member of her cluster) and other coworkers were present. (*Id.* at 4.) While at this party, plaintiff claims that while she was in a group conversation with other coworkers, she mentioned she wanted to have a child, start a family, or "words to that effect." (DE # 61 at 5; DE # 73 at 2-3.) Plaintiff claims that Martin was present when she made this statement. (DE # 61 at 4-5.) In addition to communicating her desire to start a family at this party, plaintiff also alleges that she told Martin that she was interested in having children during some of their field trips toward the end of 2004. (DE #60 at 11; DE #61 at 5.) Martin denies hearing plaintiff make such a comment at the holiday party, and denies ever talking with plaintiff about any desire or intention of hers to start a family or have children. (DE # 62 at 15.)

*E. Plaintiff's Evaluations of Supervisors and Coworkers*

Besides receiving evaluations, plaintiff also evaluated her coworkers and supervisors. She rated Martin in a survey dated November 11, 2004, and gave him above average marks in every applicable category. (DE # 69 at 5-8.) However, in the comments section of her 2004 year end review, which she signed and dated March 28,

2005, plaintiff states that "[o]bviously I have not been coached properly by Paul Martin." (DE # 69 at 4.) In addition, plaintiff evaluated Greg Sautter, a member of her cluster, on June 2, 2005, giving him uniformly top notch marks. (DE # 73 at 5-7.) She also apparently referred to Sautter in a form she submitted the day she was fired, where she stated "my male partner had worse performance than I did." (DE # 72 at 10.)

### F. Plaintiff's Policy Violations and Complaints

In January 2005, defendant learned that plaintiff had been making personal charges on her corporate credit card, in violation of defendant's policies, and that the bill on the credit card was more than 60 days past due. (DE # 67 at 19-22.) Plaintiff had previously made personal charges to the same card, and testified that she didn't know this practice was against policy. (DE # 60 at 10; DE # 61 at 3.) She explained that she had always paid off the amounts she charged for personal items, and testified that she merely charged purchases to that card in order to earn greater rewards from the credit card company. (*Id.*)

At some point after plaintiff received the 30-day warning letter in February 2005, she complained to defendant's Human Resources Manager, Marybeth Desautels that she believed Martin was discriminating against her. (DE # 77-4 at 6-7.) Specifically, plaintiff compared her performance to Sautter's and asked why she was being treated less favorably by being given a warning letter; she also argued that she was being made to do extra work and that she didn't understand why she received a warning letter "out of nowhere after . . . being told that I was doing what I was supposed to do." (*Id.* at 7-

13.) Plaintiff alleged that Desautels told her that Sautter had gotten good feedback on a recent field trip with Martin. (*Id.* at 11-13.) She testified that Desautels disagreed with her while she was still explaining what happened, and plaintiff believed that Desautels was ignoring her complaints. (*Id.* at 9-12.) Plaintiff never heard back regarding her complaints. (*Id.* at 12.)

Ultimately, plaintiff filed a complaint with the Equal Employment Opportunity Commission on or about April 4, 2005, which alleged she was being discriminated against in violation of the PDA. (DE # 1 at 7.)

### G. Allegedly Similarly Situated Employee

Plaintiff claims that Greg Sautter, who worked in her cluster apparently during some portion of 2004 and 2005 (DE # 73 at 2), is similarly situated to her and was treated more favorably by defendant. Sautter had more seniority than plaintiff, and worked as a "senior representative;" at the time she was fired, plaintiff was a professional representative, a position several levels below a senior representative. (*Id.*; DE # 60 at 10.) Martin served as Sautter's supervisor. (DE # 73 at 2.) Sautter apparently received addendums after several field trips at different dates in and before 2005. (DE # 77-4 at 13; DE # 77-38.) Sautter was expected to perform at a higher level than someone in plaintiff's position because he served in a more advanced position. (DE # 63 at 2.) On January 9, 2006, Sautter received a 30-day warning letter from Martin. (DE # 73 at 4.) Then on February 23, 2006, Martin placed Sautter on a PIP. (*Id.*) Sautter resigned shortly thereafter. (*Id.*) He disagreed with Martin's evaluation of his performance. (*Id.*)

## II. STANDARD OF REVIEW

*A. Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. PROC. 56(c)).

Once the moving party has met its burden, the nonmovant may not rest upon mere allegations. Instead, "[t]o successfully oppose a motion for summary judgment, the nonmoving party must come forward with specific facts demonstrating that there is a genuine issue for trial." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008) (citation omitted). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). Furthermore, when considering a motion for summary judgment, the court views the record and all

reasonable inferences in a light most favorable to the nonmovant. *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999).

*B. Title VII Standards*

Title VII, a portion of the Civil Rights Act of 1964, bars employers from firing or discriminating against an employee in the terms and conditions of employment on the basis of sex. 42 U.S.C. § 2000e-2(a)(2). Congress later amended Title VII via the PDA to mandate that "women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *See* 42 U.S.C. § 2000e(k). Thus, the PDA recognized "that pregnancy is a proxy for gender and, therefore, discrimination against pregnancy is discrimination against women." *Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 843 (7th Cir. 2007).

To prevail on her claim of discrimination under Title VII, plaintiff must either prove her case via the direct or indirect method. *Griffin*, 489 F.3d at 844 (citing *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1004-05 (7th Cir. 2000)). On her claim under the PDA, plaintiff elected the indirect method, which requires her to prove that 1) she was a member of a protected class and her employer knew that she was a member of that class; "(2) she was performing her duties satisfactorily; (3) she was discharged; and (4) similarly situated employees not in the protected class were treated more favorably." *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001) (citing *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1154-55 (7th Cir. 1997)). The intention to become pregnant

can make a plaintiff a member of a protected class under the PDA. *See Pacourek v. Inland Steel Co.*, 858 F. Supp. 1393, 1401 (N.D. Ill. 1994); *see also UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 198-99 (1991).

On plaintiff's retaliation claim, she relies on the direct method of proof. (DE # 76 at 16.) Under the direct method, a plaintiff can establish her claim by presenting "enough evidence to demonstrate that her discharge was a result of intentional discrimination." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722 (7th Cir. 1998). This breaks down into a three part requirement that plaintiff show: "(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by the employer; and (3) a causal connection between the two." *Moser v. Ind. Dept. of Corrs.*, 406 F.3d 895, 903 (7th Cir. 2005) (citation omitted). Evidence of these elements may either be direct or circumstantial. *See Maldanado v. U.S. Bank*, 186 F.3d 759, 763 (7th Cir. 1999). Direct evidence "can be interpreted as an acknowledgment of discriminatory intent by the defendant," *Troupe v. May Dept. Stores, Co.*, 20 F.3d 734, 736 (7th Cir. 1994), while circumstantial evidence can consist of "ambiguous statements or suspicious timing." *Maldanado*, 186 F.3d at 763 (citing *Troupe*, 20 F.3d at 736). A plaintiff may present a combination of direct and circumstantial evidence. *See id.*

## III. PLAINTIFF'S PDA CLAIM

Plaintiff's primary claim asserts that defendant discriminated against her after she communicated to her supervisor her intent to become pregnant. (DE # 1 at 6.) Defendant moves for summary judgment on this claim, alleging that plaintiff has failed

to prove three different portions of her required prima facie case under the PDA. (DE # 58 at 7-17.) Namely, defendant argues that plaintiff never indicated specifically that she intended to become pregnant and thus was not part of a protected class, that she was not performing her duties satisfactorily, and that she has failed to identify similarly situated employees that were treated more favorably than her. (*Id.*)

### A. Plaintiff's Intent to Become Pregnant

Defendant first argues that plaintiff has failed to show that she is a member of a protected class, which, in this case, would be that she intended to become pregnant. (DE # 58 at 8-11.) Specifically, defendant argues that plaintiff has only alleged that she "intended to start a family," not become pregnant, and that this contention is insufficient to make her a part of a protected class under the PDA. (*Id.*)

Plaintiff testified that she told her supervisor Martin and other coworkers at a holiday party in December 2004 that she intended to start a family. Martin denies hearing this, but as a contested fact, the court must construe plaintiff's allegation as true for the purposes of this motion. Defendant claims that this intent is gender neutral, and that the PDA protects women from discrimination only on the basis of sex because of pregnancy and related medical issues. (DE # 58 at 8-11.) In particular, defendant notes that either a man or a woman could "intend to start a family," and that a woman could "start a family" by adopting a child— a benevolent act, but one that courts have nevertheless found is not protected by the PDA. *See Donaldson v. Am. Banco Corp.*, 945 F.

Supp. 1456, 1468 (D. Colo. 1996); *Piantanida v. Wyman Ctr., Inc.*, 927 F. Supp. 1226, 1238 (E.D. Mo. 1996).

However, this argument ignores the rest of the facts in the record regarding plaintiff's communication to Martin about her intentions to start a family. Namely, in her depositions, plaintiff testified that before the December 2004 holiday party she had talked with Martin about his children and her own desire to start a family. Plaintiff testified that in conversations she had with Martin on field visits "toward the end of [2004]," she told him, "I was getting older. I wanted to have kids. I had step kids, but they're not, you know, my kids. And just saying I was planning to start a family soon." (DE # 61 at 5.)

The court understands defendant's point that the statement one wants "to start a family" or even "have kids" is somewhat ambiguous. An individual making such a statement certainly *could* be referring to adopting a child, which would not place them within a protected class under the PDA. But when considering a summary judgment motion, as defendant well knows, the court views the record and all reasonable inferences in a light most favorable to the nonmovant. *See Popovits*, 185 F.3d at 731. Here, a finder of fact could very reasonably infer that plaintiff, a married woman in her thirties with several stepchildren, was stating her intent to become pregnant when she told her supervisor that she wanted to "start a family." Indeed, because most parents produce their own children, rather than adopting, this inference is inherently logical.

Therefore, this court rejects defendant's contention that plaintiff has failed to show that she is a member of a protected class.

*B. Plaintiff's Job Performance*

Defendant's second contention is that plaintiff has failed to establish that she was performing her work duties satisfactorily. (DE # 58 at 11-16.) Defendant points to the litany of evaluations that plaintiff received, nearly all of which rated her as satisfactory in some areas and less than satisfactory in others. As one would expect, plaintiff highlights the areas where she received praise or was graded passably. (*See, e.g.,* DE # 77-2 at 11, ¶ 26.) Plaintiff also alleges that she received more positive verbal feedback than what is reflected in her evaluations, and thus defendant did not speak "with one voice," and argues that defendant's differing expectations were unclear.

The parties have submitted so many evaluations that it is difficult to know where to begin. There are annual reviews, and also a plethora of "field trip" reports (on two different types of forms) spanning the nearly three years that plaintiff worked for defendant. Thankfully, the Seventh Circuit explains that when considering an employees work performance, "[t]he proper inquiry mandates looking at [the employee's] job performance through the eyes of her supervisors at the time of her . . . termination." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008).

Plaintiff was fired on June 24, 2005.  (DE # 61 at 17.) Her most recent annual review occurred toward the end of 2004. This review was extremely poor as plaintiff received marks either at or close to the lowest possible grade on four of her six

"objectives." (DE # 69 at 1.) These four objectives comprised 85% of her evaluation. (*Id.*) Thus, plaintiff was doing very poorly in the areas her employer viewed as the most important. This review also listed her cluster's PPO as 92%, and its rank in the region as 11th, dead last. (DE # 68 at 11; DE # 69 at 2.) Thus, not only had plaintiff done poorly according to the subjective grades given by Martin, but viewed objectively through her cluster's raw sales numbers, her actual performance (albeit combined with at least one other person) was also dismal.

While her cluster's sales numbers appeared to improve during the first few months of 2005, plaintiff's subjective evaluations were below the objectives set out by defendant. Again, on the field trip report form used by defendant from 2004 on, plaintiff was graded on a five point scale, with 1 being the lowest, 5 the highest, and 3 the midpoint of "met objective." (*See* DE # 65 at 30.) In the months leading up to her termination, after her disastrous 2004 annual review and poor sales figures, plaintiff was evaluated on seven different field trips. Her average score was 2.4, decidedly below the midpoint. Further, she received sixty-three scores at the midpoint of "met objective," none above the midpoint, and forty below. Thus, on about forty percent of the criteria that plaintiff was evaluated on in 2005, she failed to meet her objectives. Furthermore, as noted above, her cluster's sales performance in 2004 was dead last in its region, and well below its goal of a 100% PPO. Thus, plaintiff failed to meet her individual performance objectives forty percent of the time, and her "group work" was consistently poor, well below the objectives set out by defendant. Accordingly, plaintiff

22

has failed to show that she was performing her duties satisfactorily. *See Argyropoulos v. City of Alton,* 539 F.3d 724, 730-31, 735 (7th Cir. 2008) (employee was not performing duties satisfactorily when she received consistently substandard reviews for several months).

Furthermore, even if this court considered plaintiff's reviews during the entire time Martin served as her supervisor, or even the entire time she worked for defendant, none of this evidence shows that plaintiff was meeting expectations. While under Lengel, plaintiff averaged more marks of "increase focus" than "observed." Plaintiff alleges that "increase focus" was not a critical remark, but her own testimony, that the mark meant one "should focus more on those skills to help you to improve," belies this.[1] (DE # 60 at 14.) As does the fact that, according to plaintiff, there was no mark lower than "increase focus" on that evaluation form. (*See id.*) Her annual reviews for 2002 and 2003, both composed by Lengel, gave her overall marks that were below the "Delivered On Objective" midpoint of the evaluations. (DE # 65 at 16, 27.) The reviews also stated that she "delivered below" her cluster's sales objective in both years, with the later review explaining that she had "delivered below the overall plan performance in 2003." (DE # 65 at 8, 20, 28.)

From Spring 2004, when Martin started reviewing plaintiff, to the end of that year, plaintiff averaged a score of 2.7, below the midpoint of 3 on defendant's five-point

---

[1] The comments on plaintiff's field trip reports, especially those drafted by Lengel, are so filled with Dilbert-esque sales terminology that it is essentially impossible to understand whether she was being praised, scolded or offered constructive criticism.

scale. Furthermore, plaintiff received only two scores above the midpoint, at four. Conversely, she received thirty-one scores below the midpoint. And her group PPOs during that period showed her cluster never ranked higher than 8th out of 11, and each time was well below its sales goals. (DE # 66 at 12-13; DE # 67 at 12-13.) The evidence presented by the parties shows that plaintiff's performance was consistently below objective during her entire time working for defendant. Thus, even taking her earlier reviews into account, plaintiff was not performing her duties satisfactorily. *See Argyropoulos,* 539 F.3d at 730-31 (employee was not performing duties satisfactorily when she received consistently substandard reviews for several months); *Geier v. Medtronic, Inc.*, 99 F.3d 238, 243 (7th Cir. 1996) (employee unable to show satisfactory performance when she had documented history of poor work); *cf. Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 773 (7th Cir. 2006) (evidence that plaintiff received "consistently favorable reviews" was sufficient to show that he was performing his duties satisfactorily); *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743 (7th Cir. 1999) (same).

Plaintiff alleges that the expectations laid out by defendant were not clear. This is contradicted by the evidence of defendant's evaluations. Each annual review had a midpoint of "Delivered on Objective," the reviews from March 2004 on all had similar midpoints of "3" or "met objective" on a 1 to 5 scale, and the measure of plaintiff's cluster's sales performance, PPO, had a clear objective of 100%. Her evaluations show that she consistently failed to meet these midpoints, especially on the most important criteria, like her sales objectives.

Plaintiff also offers hearsay statements that Martin allegedly made to her, notes the midpoint grades she received, and points to some of the unintelligible Orwellian corporate-speak in her reviews as evidence that she was in fact meeting expectations. But this argument is baseless—some positive reviews and comments earlier in an employee's tenure are not enough to cancel out the overwhelming weight of evidence that shows she was not meeting expectations. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328-29 (7th Cir. 2002) (concluding that employee whose job performance was repeatedly criticized was not meeting employer's legitimate job expectations, despite evidence that, at one point, employee had received positive performance reviews); *see also Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998) ("earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken").

Plaintiff also argues that her reviews were wrong. But disagreeing with reviews of one's performance does not create an issue of material fact. *Fortier*, 161 F.3d at 1114 (an employee's "subjective self-appraisal also cannot create a genuine issue of fact regarding the honesty of [a supervisor's] assessment of his performance") *Gustovich v. AT&T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) ("An employee's self-serving statements about his ability, however, are insufficient to contradict an employer's negative assessment of that ability.") (citing *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464-65 (7th Cir.1986)); *see also Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th

Cir. 2007) ("We have repeatedly stated . . . that plaintiffs must offer more than mere self-serving appraisals.").

Further, all three annual reviews plaintiff received showed on a clear marked scale that she was not satisfying her work duties. Overall, she was below the midpoint. And taking into consideration her cluster's poor sales and their last place rank in their region in 2004, her performance goes from below average to poor. *See Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008) (employee who was unproductive compared to other employees did not meet expectations). Plaintiff's claims about her work performance resemble a high school student's lament that her grade didn't reflect the encouraging comments her teacher gave her in person. Plaintiff would be a student who received encouragement and positive reinforcement, but routinely got Cs and Ds on her graded assignments. And her group work (here, her cluster's sales performance), merited an F. Such a student would not be meeting expectations, and similarly plaintiff was not performing her work duties satisfactorily.

Finally, none of these measures of plaintiff's work performance take into account the fact that she was discovered to have violated company policy in January 2005 by making personal expenditures on her corporate credit card. Not only that, but plaintiff had been breaking defendant's policy for an extended period of time, and had let the bill for the card go unpaid for more than 60 days, which was how defendant discovered this issue. Violating company policy in this way certainly does not help plaintiff prove that there is a material dispute of fact regarding her work performance. *See Gates*, 513

F.3d at 689 (employee unable to show satisfactory job performance when employer was unhappy with her job performance and employee had been violating company policy by using employer's phone and internet services for personal use).

Even considering the evidence in a light most favorable to plaintiff, the court determines there are no disputes of material fact regarding plaintiff's work performance that would enable this court to conclude that plaintiff was performing her work duties satisfactorily. Thus, plaintiff fails to satisfy this portion of her prima facie test.

However, Plaintiff also argues that she need not show that she was performing her duties satisfactorily (DE # 76 at 10), because "when a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of [a prima facie Title VII case merge], allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably." *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002). Thus, the court turns to whether plaintiff can make such a showing.

*C. Similarly Situated Coworkers*

To survive summary judgment, plaintiff must show that similarly situated employees who were not intending to become pregnant "were treated more favorably." *See Clay*, 253 F.3d at 1005; *Grayson*, 308 F.3d at 818-19. Such a similarly situated employee must be "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Plaintiff points to Sautter, a

member of her cluster and a senior professional representative. This comparison fails for multiple reasons.

First, plaintiff fails to demonstrate that she was "similarly situated" to Sautter. To begin, Sautter was a senior representative, a position two promotions above plaintiff. While both Sautter and plaintiff worked in the same cluster and had the same supervisor, it is clear that Sautter had far more experience and was held to a higher standard of performance than plaintiff. *See Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531-32 (7th Cir. 2003) (whether employees "held the same job description," were "subject to the same standards," had the same supervisor, and "had comparable experience, education, and other qualifications" relevant in determining whether they were similarly situated). Notably, plaintiff has failed to argue or present any evidence that she and Sautter had similar job descriptions, were held to the same standards, or had similar experience and qualifications. (*See* DE # 76 at 10-12); *Ajayi*, 336 F.3d at 532.

Further, in order to be comparable to a fired employee, a coworker must have a similar performance record. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (plaintiff must show that other employee had a "comparable set of failings" to be similarly situated to fired employee). Here, plaintiff offers Sautter's thirty day warning letter, and one addendum, written on October 31, 2005, more than four months after she was fired. (DE # 77-37; DE # 77-38.) She also offers a hearsay statement that Sautter told

her he had received at least three addendums by February 2005.[2] (DE # 76 at 11; DE # 77-4 at 13.) But plaintiff supplies no further evidence. Certainly, these pieces of evidence are critical of Sautter's performance, but they do not show that Sautter had the same consistent record of mediocre field trip reports and poor cluster sales figures as plaintiff. There is uncontested evidence that Sautter worked in the same cluster as plaintiff (*see* DE # 73 at 1) and thus some of her cluster's poor sales may be attributed to him, but plaintiff has identified no evidence showing when he worked in her cluster or for how long. (*See* DE # 76 at 10-12.) And plaintiff has presented no evidence that Sautter's cluster's performance did not improve after she left. Indeed, she has presented no evidence whatsoever about his cluster's sales figures for all of 2005.

In addition, what information can be gleaned about Sautter's performance from the few documents plaintiff has provided shows that it was better than her own. Specifically, the second page of Sautter's 30-day warning letter stated that "you have consistently received '4's on pre-call planning tasks 1 and 2." (DE # 77-37 at 2.) In contrast, in more than a year of reviews via the same metric, plaintiff only received a score of 4 twice. Also, the addendum plaintiff provides criticized Sautter for receiving a

---

[2] This statement is inadmissible as it is self-serving hearsay, mentioned only by plaintiff and not by Sautter in his affidavit, and plaintiff fails to identify an applicable exception. "Offering a statement by a third party . . . to prove a fact contained in that statement is inadmissible hearsay." *Matthews v. Wis. Energy Corp. Inc.*, 534 F.3d 547, 557 (7th Cir. 2008). Further, even if the statement was admissible, it would be of limited relevance, as plaintiff offers no further details about what led to Sautter's addendums, when they were given or over how long a time period. And plaintiff fails to present any evidence that defendant has a policy of issuing 30-day warning letters after a certain number of addenda. Thus, this hearsay evidence is largely irrelevant.

score of 2 on one task. (DE # 77-38 at 1.) But it does not mention Sautter receiving any other scores of 2, or having received any such scores in the past. (*See id.*) This contrasts sharply with plaintiff, who received over twenty-five 2s during 2004, and forty 2s in less than six months in 2005. *See Lucas*, 539 F.3d at 667 (employee not similarly situated to plaintiff when employee performed better than plaintiff); *cf. Fischer v. Avanade, Inc.*, 519 F.3d 393, 402-03 (7th Cir. 2008) (employees similarly situated when had similar experience, skill level, and performance reviews).

Further, plaintiff had the opportunity in discovery to subpoena nearly all of Sautter's work evaluations, in effort to lay out a case of similar under-performance. But she failed to do so. (Indeed, plaintiff has not provided *any* of Sautter's annual reviews or field trip reports.) This makes her failure to provide additional evidence showing that she and Sautter performed similarly especially damaging. Finally, plaintiff presents no evidence whatsoever showing that Sautter violated company policy like she did by impermissibly using defendant's corporate credit card. *See Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008) (employees not similarly situated where one was disciplined for violating company policy regarding absences and others were not).

Second, even if Sautter was similarly situated to her, plaintiff also fails to show that he received disparate treatment. Within six months of plaintiff's termination, Martin gave Sautter a thirty-day warning letter, and placed Sautter on a PIP six weeks later. (DE # 73 at 4.) Sautter then resigned. (*Id.*) Thus, Sautter received exactly the same disciplinary treatment as plaintiff, with only difference that he resigned before he was

fired. Also, just like plaintiff, Sautter stated that he "disagreed with Mr. Martin's evaluation of my performance and believed my performance did not warrant the discipline I received." (*Id.*) Plaintiff's only admissible evidence that Sautter received disparate treatment is the timing of their respective discipline, and her own opinion that he was performing worse than she was. But her statements are belied by the glowing review she gave of Sautter shortly before her termination. (*See* DE # 73 at 5-7.) And the timing proves very little, given plaintiff's failure to provide a fuller record of Sautter's performance. Further, as explained above, Sautter was a higher level employee with more seniority and, apparently, better evaluations. His longer tenure with the company, by itself, may well have earned him more time to prove himself, as an employer will logically be more lenient with an employee in whom it has invested greater time and expense.

To summarize, plaintiff has failed to show that a similarly situated employee was treated more favorably. The one coworker she identifies (and presents limited evidence on) was more senior, of a higher rank, and appears to have performed far better. There is no evidence he violated company policy like plaintiff did with her abuse of defendant's corporate credit card. Thus, this employee was not similarly situated. Furthermore, that coworker was also subject to the same disciplinary procedures as plaintiff, and eventually resigned because of it. The evidence does not show that he was treated more favorably. Therefore, the court finds that there is no genuine issue of material fact and that plaintiff failed to satisfy her requirement of showing that

similarly situated employees were treated more favorably. Accordingly, the court will grant summary judgment to defendant on plaintiff's PDA claim.

## IV. PLAINTIFF'S RETALIATION CLAIM

Plaintiff's final claim alleges that defendant retaliated against her by firing her after she complained to defendant's human resources employee Marybeth Desautels and after plaintiff filed an EEOC complaint alleging she was being discriminated against in violation of the PDA. (DE # 1 at 5.) Title VII forbids employers from punishing employees for complaining about discrimination or other practices that violate Title VII. 42 U.S.C. § 2000e-3(a). Plaintiff relies on the direct method of proof for this claim. (*See* DE # 76 at 16.) Succeeding on a retaliation claim via this method requires plaintiff to show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by the employer; and (3) a causal connection between the two. *Moser*, 406 F.3d at 903. Failure to show any one of these required elements is fatal to plaintiff's claim. Defendant does not contest that plaintiff suffered an adverse employment action by being placed on a PIP and being fired, but does argue that she fails to satisfy the first and third elements.

### A. Plaintiff's Engaging in Protected Activity

In regard to the first element, plaintiff alleges that she engaged in protected activity by complaining to Desautels and by filing her EEOC complaint. However, this court determines that plaintiff did not engage in protected activity by complaining to Desautels. As noted by defendant, the Seventh Circuit has held that in order to have a

complaint with an employer qualify as "statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Here, plaintiff fails to show that she complained to Desautels that she was being discriminated against because of her stated intention to become pregnant. Instead, plaintiff just testified that she believed she was being treated more harshly than her coworkers, and never claims she told Desautels that Martin was discriminating against her based in her membership in any protected class. (DE # 78 at 21-27.) Indeed, in plaintiff's response brief, she merely asserts that she "specifically told Desautels that she believed that she was being discriminated against by Martin." (DE # 76 at 17.)

But bare bones complaints regarding "discrimination" are not enough to make a complaint into activity protected by Title VII—"[m]erely complaining in general terms of discrimination . . . without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich*, 457 F.3d at 663; *see also Gates*, 513 F.3d at 687-89 (employee's complaint to employer about a "glass ceiling," by itself, may not be enough to make her complaint protected activity under Title VII); *Sitar v. Ind. Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (plaintiff's retaliation claim failed because plaintiff's complaint to his employer "did not invoke any action protected by Title VII"). Therefore, this court holds that plaintiff has failed to show that her complaint to Desautels in February 2005 was protected activity. However, plaintiff's

EEOC complaint does count as protected activity, and thus satisfies this portion of her prima facie case.

*B. Adverse Employment Action*

Plaintiff alleges that she suffered an adverse employment action by being placed on the PIP and being fired. Defendant does not dispute this. However, plaintiff did not engage in protected activity by complaining to Desautels, as explained above, thus leaving her filing of an EEOC complaint as her only protected activity. Plaintiff did not file her EEOC complaint until April 4, 2005 (DE # 1 at 7), and she was placed on a PIP *before* this date, on March 25, 2005. (DE # 69 at 13-19.) Accordingly, since plaintiff did not engage in protected activity until more than a week after she was placed on a PIP, being placed on a PIP cannot qualify as an "adverse employment action." *See DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, 441-43 (5th Cir. 2007) (defendant granted summary judgment on retaliation claim when adverse employment action preceded her engaging in protected activity). Instead, the only applicable adverse employment action is her termination, which occurred on June 24, 2005, well after she filed her EEOC complaint.

*C. Causal Connection*

Thus, plaintiff's retaliation claim hinges on showing a causal connection between her filing of an EEOC complaint and her firing. "A causal link between the protected expression and an adverse employment action may be established by showing that the

protected conduct was a substantial or motivating factor in the employer's decision."
*Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005) (citation omitted).

Plaintiff argues that three things demonstrate such a casual connection. (DE # 76 at 17-19.) First, she points to the timing of her firing, which came approximately two and a half months after she filed her EEOC complaint. (*Id.* at 17-18.) Second, plaintiff alleges that her coworkers and customers made statements to her about how Martin was treating her. (*Id.* at 18.) Third, plaintiff argues that the contrast between Martin's allegedly positive verbal comments to her and his negative written reviews show that his evaluations were really a pretext for retaliation. (*Id.* at 18-19.) However, the court determines that these three pieces of evidence fail to raise a genuine issue of material fact regarding any causal connection between plaintiff's filing of an EEOC complaint and her termination.

First, suspicious timing serves as circumstantial evidence that can support a retaliation claim, *Troupe*, 20 F.3d at 746, but, by itself, is insufficient to create a genuine issue of material fact, *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004), unless there is a very short period of time between the protected activity and the adverse employment action, like a period of "days, or at most, weeks." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008). Here, plaintiff filed her EEOC complaint on April 4, 2005, and was fired on June 24, 2005. This time period stretches more than two months. Thus, plaintiff must present more evidence beyond timing to raise a genuine issue of material fact.

Unfortunately for plaintiff, her second piece of evidence, her testimony that other people commented to her about how Martin treated her, is hearsay. This statement was made by others, and its sole purpose is to relay an impression about, as plaintiff puts it, "the way Martin was treating her."[3] (DE # 82 at 4.) And plaintiff has failed to identify any applicable exception that might apply. (*See id.* at 3-4.) Therefore, this statement is inadmissible and will not be considered. *See Matthews* 534 F.3d at 557 ("Offering a statement by a third party . . . to prove a fact contained in that statement is inadmissible hearsay."); *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994) (affidavit containing statement by unnamed third party is inadmissible hearsay).

Furthermore, even if this court were to consider this hearsay, plaintiff states that people made these comments to her "sometime in the beginning of '05 after I received the warning letter." (DE # 77-4 at 2.) She received the warning letter on February 15, 2005. (DE # 68 at 2-6.) She did not engage in protected activity until April 4, 2005, more than a month a half later, and April 4th, more than three months into a calendar year, does not strike this court as a date "in the beginning" of a year. Thus, it appears highly

---

[3] Plaintiff insists this statement is not hearsay (DE # 82 at 4.), but a look at her actual testimony shows that it is. The exact statement from plaintiff's deposition is "they brought up something to the effect where they saw the way Paul was treating me, and they asked me what was going on, and if I was in trouble, something to that effect." (DE # 77-4 at 2.) Thus, plaintiff is testifying to what other people "brought up," or told her— that they "saw the way [Martin] was treating me." That is a statement (I saw the way he treated you) made by a third party (the unnamed others) to prove the matter asserted (that they saw how he was treating her). If plaintiff was simply relaying that the unnamed declarants had made comments to her, that would not be hearsay. But as soon as she began describing the substance of their comments her statement became hearsay.

unlikely that the hearsay statements other people made to plaintiff about how Martin was behaving referred to actions taken by Martin *after* she filed her EEOC complaint. Accordingly, this evidence, even if it were not hearsay, is irrelevant and fails to show a causal connection.

Third, plaintiff contends that Martin's allegedly positive comments to her, which contrasted with his critical written evaluations, are enough to show a causal connection between her filing of an EEOC complaint and her firing. But this argument ignores the rest of the evidence in the case, which shows that for the entire time Martin evaluated her, plaintiff interpreted his verbal feedback as far more positive than his written reports. (*See, e.g.,* DE # 69 at 4 (regarding her poor 2004 annual review, "I have been told . . . that I have been meeting expectations").) Thus, his two-faced behavior, if it did continue after her filing of her EEOC complaint, was consistent with his behavior beforehand. This does not show a causal connection between her filing of the EEOC complaint and her firing.

Furthermore, as defendant notes, and as the court has explained in detail above, plaintiff had a long-standing record of poor sales performance and middling to poor subjective evaluations. Every annual review she received showed that she was not meeting expectations, her sales figures for her last year on the job were ranked dead last, and she consistently received mediocre subjective evaluations. And in regard to her current claim, this record long predated her filing of an EEOC complaint. Indeed, well before plaintiff filed her complaint, Martin had composed her awful 2004 annual

review, given her the 30-day warning letter, and placed her on a PIP, and defendant had discovered that plaintiff had charged personal items on her corporate credit card in violation of company policy and let the bill go two months past due. Of particular note is plaintiff being placed on a PIP, the last step before termination in defendant's probationary-like process for underperforming sales employees. Again, defendant placed her on a PIP *before* plaintiff filed her EEOC complaint.

In addition, the field trip reports plaintiff received after filing her retaliation claim were very similar to those Martin composed shortly beforehand. (*Compare* DE # 67 at 23-25; DE # 68 at 1, 7-10; *with* DE # 70 at 1-4, 8-11, 16-17; DE # 71 at 1-2, 3-6, 15-19.) This dispels any causal connection between her poor evaluations and her EEOC complaint. Since plaintiff's poor performance and evaluations predated her filing of an EEOC complaint and continued afterwards, she fails to show a casual connection between the complaint and her firing. *See, e.g., Gates*, 513 F.3d at 689 (termination was not retaliation when plaintiff had poor performance before she complained of discrimination).

The court holds that there is no genuine issue of material fact regarding this portion of plaintiff's retaliation claim, even taking the facts in a light most favorable to plaintiff, as this court must. There is simply no evidence that defendant's treatment of plaintiff changed after she engaged in protected activity. As a result, plaintiff's retaliation claim fails, and, thus, the court will grant defendant summary judgment.

**V. CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment (DE # 57) is **GRANTED**. The court hereby **CANCELS** all settings herein and **DISMISSES AS MOOT** the pending scheduling motion (DE # 86). Counsel are reminded to inform any witnesses scheduled for testimony at trial that they are not to appear. The clerk is to **ENTER FINAL JUDGMENT** stating:

> Judgment is entered in favor of defendant Merck & Co., Inc. and against plaintiff Rochelle D. Bachelor, who shall take nothing by way of her complaint.

**SO ORDERED.**

**DATED:** December 10, 2008

 s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT